Howard A. FROMSON, Appellant,

v.

ADVANCE OFFSET PLATE, INC., Graphcoat, Inc., News Publishing Company of Framingham, Newspapers of New England, Inc., Appellees.

Appeal Nos. 83–850, 83–913, 83–914 and 83–915.

United States Court of Appeals, Federal Circuit.

Nov. 8, 1983.

John E. Lynch, New York City, for appellant.

Arthur F. Dionne, Windsor, Conn., for appellees.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and NICHOLS, Senior Circuit Judge.*

MARKEY, Chief Judge.

Appeal from four judgments of the U.S. District Court for the District of Massachusetts holding that claims 1, 4, 6, 7, 12 and 16 of U.S. Patent 3,181,461 issued to Fromson are not infringed or contributorily infringed. We vacate and remand.

## BACKGROUND

### A. The Technology

The Fromson patent involves a process for making a photographic printing plate for use in the art of lithography. The art involves creation on a printing surface of certain areas that are hydrophilic (water attracting) and organophobic (ink repelling) and other areas that are organophilic (ink attracting) and hydrophobic (water repelling).

At the time of the Fromson invention, the state of the art was depicted generally by U.S. Patent 2,714,006, issued on July 26, 1955 to Jewett and Case (Jewett). Jewett teaches the preparation of a presensitized lithographic plate by: first treating the surface of an aluminum sheet with an aqueous solution of an alkali metal silicate to form a water insoluble, hydrophilic, siliceous, organophobic surface layer; treating that layer with a diazo compound to form a light-sensitive, water soluble, diazo coating; and exposing portions of the coated plate to light through a negative or stencil, thus causing the exposed portions to become water insoluble, hydrophobic, organophilic image areas. The plate is then washed

* Judge Nichols assumed senior status October 1, 1983.

with water to remove the water soluble diazo portions that were not exposed to light, thereby exposing the water insoluble, hydrophilic, organophobic, siliceous surfaces in their place (non-image areas). An image developer or printer's developing ink is poured on the plate and the excess wiped off, making the image areas plainly visible. The plate is then ready for mounting on a press, successive treatments with water and ink, and printing. In this process, the image areas absorb ink while the non-image areas repel it.

### B. *The Fromson Patent*

In the 1950's, Fromson was in the business of selling metals and began, through Ano-Coil Corporation, to manufacture and sell anodized aluminum. In anodization, aluminum is coated with oxide while it is the anode in an electrolytic bath wherein it is subjected to an electric current, whence the term "anodized". The anodized aluminum was used in articles such as television antennas, furniture tubing, and nameplates.

Fromson, with no background in lithography, conceived of using anodized aluminum as a replacement for non-anodized aluminum in the plate taught by Jewett. His invention according to the Fromson patent improves the Jewett plate in a number of ways. It enables use in preparation of the plate of light-sensitive compounds · other than diazo compounds. It enables the coating to absorb nitrogen-containing materials released by the light-sensitive compounds when exposed to light. Also, as the district court found, the Fromson plate enjoys improved corrosion resistance and a longer press life.

Fromson filed his application for patent in May, 1963, and the patent issued in May, 1965, containing eleven product and five process claims. Claim 1 is representative of the product claims:

1. A sensitized photographic printing plate comprising an aluminum sheet having a surface which has been treated to form an aluminum oxide coating on said surface, a water-insoluble, hydrophilic, organophobic layer on said sheet resulting from the reaction of the aluminum oxide coating and an alkali metal silicate ap-

plied to said coating, and a light-sensitive coating over said layer [*e.g.,* diazo resin] having one solubility in relation to a solvent in a state before exposure to light and another solubility in relation to said solvent in another state after exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.

Claim 12 is the sole independent process claim:

12. The process of making a sensitized photographic plate comprising the steps of applying to an aluminum sheet having a coating of aluminum oxide, a water-solution of an alkali metal silicate to cause the silicate to react with the aluminum oxide to form a water-insoluble, hydrophilic, organophobic layer on said sheet, drying the layer, and applying over the dry layer a light-sensitive coating having one solubility in relation to a solvent in a state before exposure to light and another solubility in relation to said solvent in another state after exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.

### C. *The Advance Plate*

After issuance of his patent, Fromson's invention enjoyed extensive commercial success and was the subject of licensing agreements with several companies. Fromson sued Advance Offset Plate, Inc. ("Advance"), charging·it with infringement and contributory infringement of product claims 1, 4, 6 and 7, and process claims 12 and 16. He also sued three Advance customers for direct infringement in actions consolidated with that against Advance and now consolidated on appeal. We assume for purposes of this appeal that the claims at issue in those three cases are the same as those asserted against Advance.

It is undisputed that Advance manufactured and sold "wipe-on" plates compris-

ing an anodized aluminum sheet that had been treated with an aqueous solution of sodium silicate, and that its customers applied a diazo coating to those plates. Because the claims include the application of a diazo coating or other light sensitive layer and because Advance's customers, not Advance, applied the diazo coating, Advance cannot be liable for direct infringement with respect to those plates but could be liable for contributory infringement. It is also undisputed that Advance, not its customers, applied the diazo resin to certain "presensitized" plates. For those presensitized plates, Advance could be liable for direct infringement.

Though preparation of the Advance plate involves treatment of anodized aluminum with an aqueous solution of alkali metal silicate to yield a water-insoluble, hydrophilic layer, as set forth in the claims, Advance and its customers deny infringement on the sole ground that there is no "reaction" between the aluminum oxide and sodium silicate. It is undisputed that Advance and its customers do what the claims say, i.e., apply a water solution of an alkali metal silicate to an oxide coated aluminum sheet to produce a layer, but it is argued that the layer does not result from a "reaction" as we are asked by Advance to define that term.

During oral argument on appeal, Advance suggested that its process involves different conditions (e.g., temperature, time) than the Fromson process, an argument neither raised in the brief nor addressed by the district court. Though the argument cannot therefore be considered here, we caution that the asserted claims contain no temperature or time limitations, and that no basis appears on this record for limiting the claimed inventions to preferred embodiments or specific examples in the specification. See, Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1935).

### D. District Court's Decision

By Memorandum and Order dated May 30, 1980, the district court separated the issues of infringement and invalidity from other defenses and counterclaims. On February 11, 1983, after trial without a jury, the district court found no infringement of "the patent". Because the finding could apply properly only to the six claims at issue, we review the decision as if only the six claims were involved. 219 USPQ 83 (D.Mass.1983). The district court did not resolve the validity issue, noting that the patent had expired. If infringement during the period before expiration be found, the validity issue would of course become viable.

The district court held that the claims of the Fromson patent, when read in light of the specification and prosecution history, must be interpreted as requiring that the water-insoluble, hydrophilic, organophobic layer be the product of a chemical reaction between the aluminum oxide coating and the alkali metal silicate, and that that product be a compound having physical properties different from those of its constituents. Finding no such reaction in preparation of Advance's plates, the district court entered a judgment of noninfringement in the four consolidated actions.

The district court considered unpersuasive three laboratory tests and testimony of Fromson's expert, based on those tests, that Advance's plate had a surface layer resulting from reaction of sodium silicate and anodized aluminum. It considered persuasive the tests and testimony of Advance's expert, who concluded that there is no reaction product of aluminum oxide and silicate on Advance's plate, but that the surface is coated with silica, an insoluble, hydrophilic material. Resolution of that conflicting testimony is not necessary, however, where, as here, a legal conclusion establishes its irrelevance. Indeed, we accept for this opinion that the Advance plate involves the formation of silica.

The district court made no finding on whether silica is organophobic. In response to request for admission number 29, Advance stated that it employs a sodium silicate coating believed hydrophilic and organophobic. The district court found that silica (not sodium silicate) is formed on Advance's plate. On remand, a finding of infringement will require a determination

of whether the layer on Advance's plates is water insoluble, hydrophilic *and* organophobic.

The district court made no finding on the identity of the layer produced by the process described in the Fromson patent as the preferred process embodiment (*i.e.,* 155–210°F. and 1–10 minutes of treatment time). At trial, Advance's expert said that the Fromson process does not produce aluminosilicate within those time and temperature parameters. He also said, however, that although silica was first formed when he treated aluminum oxide crystals with an aqueous solution of an alkali metal silicate within those parameters, aluminosilicate could form after treatment lasting one hour.

### E. Reissue Proceeding

On March 29, 1979, after the four suits were filed, Fromson filed for reissue in the Patent and Trademark Office ("PTO") under a procedure which then allowed for reissue proceedings and reexamination in light of new prior art. Advance participated as a protestor in accordance with PTO rules. Before the judgment in the district court was rendered, the PTO again concluded that Fromson's claims were patentable.

### Issue

Whether the district court erred in finding no infringement or contributory infringement of claims 1, 4, 6, 7, 12, and 16.

### Opinion

■ The issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another. *SSIH Equipment S.A. v. USITC,* 718 F.2d 365, 376, 218 USPQ 678, 688 (Fed.Cir.1983). The first is a question of law; the second a question of fact. *Id.; Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771, 218 USPQ 781, 788, 789 (Fed. Cir.1983). The present decision of the district court turned on the first question, which we review as a matter of law.

### A. Contentions of the Parties

Advance and its customers contend that "the Court was totally convinced, based on the evidence presented, that Fromson was indeed referring to and claiming a 'reaction product' formed by the reaction of an aluminum oxide with sodium silicate, *i.e.,* an aluminosilicate compound". We agree that the district court so interpreted the claims.

Fromson argues that "reaction" in the claims should be interpreted to cover the claimed treatment of an oxide coated aluminum sheet with an aqueous solution of alkali metal silicate to form a water insoluble, hydrophilic, organophobic layer on the sheet, and that whether the layer is an aluminosilicate compound is irrelevant, there being no reference to any such compound in the asserted claims. We agree.

### B. Claim Construction—The Specification

■ In *Autogiro Co. of America v. United States,* 384 F.2d 391, 397, 155 USPQ 697, 702 (Ct.Cl.1967), our predecessor court recognized that patentees are not confined to normal dictionary meanings:

> The dictionary does not always keep abreast of the inventor. It cannot. Things are not made for the sake of words but words for things. To overcome this lag, patent law allows the inventor to be his own lexicographer. (Citations omitted.)

A patentee's verbal license "augments the difficulty of understanding the claims", and to understand their meaning, they must be construed "in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application". *Id. Accord, General Electric Co. v. United States,* 572 F.2d 745, 751–53, 198 USPQ 65, 70–73 (Ct.Cl. 1978).

This appeal hinges on construction of "reaction". The specification discloses a new and improved method of forming plates for use in lithography. Fromson discovered that the treatment of anodized aluminum with an aqueous solution of water soluble alkali metal silicate produces a water insol-

uble, hydrophilic, organophobic layer on the aluminum, a layer having exceptional lithography-related properties. Fromson's invention included the formation of the layer, not its exact structure. Though Fromson referred to the disclosed treatment as involving a "reaction", he also referred to it in the specification as an "application" and as "adsorption". Not all references to "reaction" were accompanied by a reference to formation of an aluminosilicate.

 Fromson did theorize that his new, improved layer was an aluminosilicate believed "to be in the nature of a commercial zeolite", having "properties of a molecular sieve", but expressed that theory as merely a "belief". There is no basis or warrant for incorporating that belief as a limitation in the claims. It is undisputed that inclusion of Fromson's theory and belief was unnecessary to meet the enablement requirement of 35 U.S.C. § 112 (that a patentee describe how to make and use the invention). Moreover, it is axiomatic that an inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests. *See, e.g., Diamond Rubber Co. v. Consolidated Rubber Co.*, 220 U.S. 428, 435–36, 31 S.Ct. 444, 447–48, 55 L.Ed. 527 (1911).

### C. Claim Construction—The Claims

 Significant evidence of the scope of a particular claim can be found on review of other claims. *General Electric v. United States, supra*, 572 F.2d at 752, 198 USPQ at 70. Here, claim 5 (not asserted) limits the layer described in claim 1 to "an aluminosilicate structure in the nature of a zeolite molecular sieve", *i.e.*, to Fromson's theory of what is formed. In *Kalman v. Kimberly-Clark Corp., supra*, 713 F.2d at 770, 218 USPQ at 788, this court said "where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement". *Accord, Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699, 218 USPQ 865, 871 (Fed.Cir.1983); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1115, 219 USPQ 185, 188 (Fed.Cir.1983). The alumi-

nosilicate limitation of narrow claim 5 cannot, therefore, be read into broader claim 1.

 Advance and its customers argue that, had appellant originally sought product by process claims, those claims would have been disallowed because each claimed element would have been old, citing the district court's finding 18 containing "combination of old element" terminology. This argument is without merit. First, it is a hypothetical. That a process limitation appears in a claim does not convert it to a product by process claim. Second, there is no basis for treating combinations of old elements differently in determining patentability. The analysis under 35 U.S.C. § 103 for any claimed invention requires a legal determination of whether the claimed invention as a whole would have been obvious to one of ordinary skill in the art at the time it was made. *See, e.g., Environmental Designs, Ltd. v. Union Oil of California, supra; Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 218 USPQ 271 (Fed.Cir.1983).

### D. Claim Construction—Prosecution History

The district court noted some of Fromson's arguments during prosecution of his application, in which he stressed the importance of "reacting" anodized aluminum with alkali metal silicate. However, whether the interaction of these two materials was a "reaction" or something else was immaterial to consideration of the prior art. It does not appear, moreover, that Fromson used "reacting" in his arguments any differently than he had in the specification and claims, *i.e.*, to describe what he believed the interaction was between oxide coated aluminum and an aqueous solution of alkali metal silicate. Thus, Fromson's arguments focused on the fact of an interaction and production of a new layer with particular properties, not on the specific nature of the interaction or on any chemical structure of the layer.

That Fromson speculated, on one page of a response to a rejection, that the reaction layer is "believed to be in the nature of a commercial zeolite" is of no moment, in

view of the total absence from the other thirteen pages in that response of any reference to formation of an aluminosilicate or zeolite, and in view of his clear labeling of the zeolite statement as a "belief". Instead, Fromson referred in those thirteen pages to an aluminum oxide-sodium silicate reaction surface or layer, indicating that he did not know, and did not care, what the "reaction" or the structure of the resulting product might be.

 Advance and its customers argue that the "prime issue" in this appeal is the doctrine of prosecution history ("file wrapper") estoppel. That doctrine, however, is inapplicable here. If there be literal infringement, direct and contributory (as there may be here under a proper construction of the claims), the doctrine is irrelevant. Even if it were applicable, an examination of a prosecution history demonstrating that "reaction" was merely a theoretical label having no influence on the patentability of the claimed invention as a whole demonstrates the absence of prosecution history estoppel.

E. *Claim Construction—Other Considerations*

That "reaction" in the claims need not be confined to production of an aluminosilicate is consistent with the dictionary definition. That in Webster's New Collegiate Dictionary (1974) includes both "chemical transformation or change", and "interaction of chemical entities", which are consistent with the definitions appearing in Hackh's Chemical Dictionary (1969) and the American Heritage Dictionary (1970).

When an oxide coated aluminum surface is contacted with an aqueous solution of water soluble alkali metal silicate, chemical change occurs in at least two ways. First, ions or other chemical units in solution have somehow interacted to form a solid structure. Second, the water insoluble solid structure, whatever may be its precise nature (*e.g.,* silica or aluminosilicate), is not identical to the water soluble alkali metal silicate and oxidized aluminum that interacted to produce it. Moreover, there is clearly present an "interaction of chemical entities".

 The foregoing is fully consistent with long-standing use of "reaction" in the lithography art. Claims are normally construed as they would be by those of ordinary skill in the art. *See e.g., Schenck v. Nortron Corp.,* 713 F.2d 782, 785, 218 USPQ 698, 701–02 (Fed.Cir.1983). Jewett interchangeably uses terms such as "treating", "treatment", and "react", to describe a lithographic plate producing process. Jewett's claims use "reacting", "treatment", and "reaction product". Jewett makes no attempt to define the structure of the layer there disclosed (as an aluminosilicate compound or otherwise), although it does mention the hydrophilic layer as being chemically bonded to the aluminum surface. Jewett refers to the layer as "silicate treatment", as "silicate or silicon containing" film, or as "an inorganic material such as silicate". It is not unreasonable to conclude that one of ordinary skill in the lithography art would interpret "react" in Fromson to mean the same thing it appears to mean in Jewett, *i.e.,* the treatment of a metal substrate with an aqueous solution to yield a layer, regardless of the chemical structure of the layer or the proper label for the phenomena that produced it.

CONCLUSION

We hold, therefore, that the district court erred as a matter of law in interpreting the claims as limited to the product of a chemical reaction producing a new chemical compound in the restrictive sense of those terms. There having been no finding by the district court that the accused plates have a layer that is water insoluble, hydrophilic *and* organophobic, the determination of infringement and contributory infringement must await complete findings in the first instance by the district court.

DECISION

The four judgments based on findings of noninfringement of Fromson's asserted claims are vacated, and the cases are remanded for further consideration consistent with this opinion.

**VACATED AND REMANDED.**