**Henry J. BARON, Plaintiff,**

v.

**BAUSCH & LOMB, INC., Defendant.**

**No. CIV–79–2C.**

United States District Court,
W.D. New York.

Oct. 22, 1985.

Marchiondo & Berry, P.A. (Charles G. Berry, Albuquerque, N.M., of counsel), for plaintiff.

Allegretti, Newitt, Witcoff & McAndrews, Ltd. (Edward W. Remus, and Robert C. Ryan, Chicago, Ill., of counsel), for defendant.

CURTIN, Chief Judge.

Plaintiff Henry J. Baron claims that several hundred soft contact lenses produced by defendant Bausch & Lomb, Inc., a leading contact lens manufacturer, infringe his patent No. 3,698,802 [802] issued October 17, 1972, and his patent No. 4,048,890 [890] issued April 18, 1978.

*History*

This action was commenced in Colorado nearly seven years ago. It was transferred to the late Honorable Harold P. Burke of this district on January 2, 1979. At the time it reached my docket in mid-1981, plaintiff's only action, except for responding to defendant's papers, had been the filing of a single set of interrogatories. In response to an order to show cause why the case should not be dismissed for failure to prosecute, plaintiff stated that "[t]he only thing remaining in the course of discovery [by plaintiff] is to set a series of depositions and, thereafter, any pretrial matters...."

Relying on these representations, the court did not dismiss the action, but ordered that discovery be completed within 90 days (Item 17). No discovery was undertaken by plaintiff, and defendant moved to dismiss in February of 1982. That motion was denied, and plaintiff was ordered to proceed vigorously with discovery (Item 32).

In mid-1982, defendant gave more than 400 contact lenses to plaintiff. Bausch & Lomb also provided plaintiff with more than 500 confidential design drawings depicting each accused lens. These drawings are protected by a stipulated protective order filed July 23, 1982 (Item 49). The order limits the number of people who can see the drawings to those on the staff of plaintiff's attorney and to independent consultants agreed to by both parties. Although the number of consultants who had access to the drawings was limited, Baron has been free, for the past three years, to show the actual lenses to any consultant for study and photographing. These lenses are available on the open market.

In April of 1984, defendant again moved for dismissal for failure to prosecute. Although little appeared to have been done by plaintiff during the intervening two years, the court was reluctant, in view of discovery disputes between the parties, to impose such a harsh sanction and again denied defendant's motion (Item 147).

*Pending Motions*

Plaintiff has moved to compel discovery of, among other things, information as to defendant's manufacturing processes, the physical characteristics of its lenses, and reports relating to the design progression of the lenses. Defendant has moved for partial summary judgment on the issue of infringement by Bausch & Lomb's "minus" contact lenses. The court has carefully reviewed the record and considered the positions the parties advanced at oral argument. For the reasons below, plaintiff's motion to compel is denied, and defendant's motion for partial summary judgment is granted.

*The Claims*

Baron's 802 patent has three claims, the latter two being dependent upon Claim 1, the most significant portion of which reads:

> [S]aid lens being provided with a thickened annular bead portion extending outwardly from said convex surface between the optical zone and the lens edge, said bead portion having a curved, convex outer surface and a generally centrally located portion defining the area of maximum thickness of the lens.

The 890 patent has six claims, with the final five dependent on the first. Claim 1 of the 890 patent reads, in pertinent part:

> [T]he juncture of said optical zone and said peripheral portion being defined by a visually apparent change in the shape of said outer surface of said optical zone at said juncture, said peripheral portion having a region intermediate said edge and said juncture, said region being thicker than at said edge or said juncture.

Bausch & Lomb, Inc., produces both "minus" and "plus" lenses. The minus lenses are worn by near-sighted people; the plus correct farsightedness. Only the minus lenses are at issue in defendant's motion for partial summary judgment. Defendant urges that none of its minus contact lenses

has the features required by claims of the 802 and 890 patents. Rather than an annular bead, as described in the 802 patent, or thickened region following a visually apparent break, as described in the 890 patent, defendant maintains that the peripheral region of its minus lenses continuously tapers to the edge.

*Baron's Motion to Compel Discovery*

Plaintiff maintains that he needs further discovery to ultimately prove infringement and, more importantly, to properly defend against the motion for partial summary judgment. (This position is somewhat contradictory, since two of plaintiff's consultants have expressed the opinion that certain lenses infringe plaintiff's 802 patent based solely on the drawings and/or photographs.)

The design drawings provided by defendant were prepared by a computer. As stated in response to one of plaintiff's interrogatories:

> The computer is provided with confidential processing details such as the identity of the materials and procedures used to manufacture the rotating mold in which the soft contact lenses are produced, the amount and physical properties of the chemical mixture used to form the soft contact lenses and which is placed in the rotating mold, the rotational speed of the rotating mold to form the lens and the reaction conditions.

Item 176, Exh. 5, Interrogatory # 33.

Plaintiff primarily seeks all the information used by the computer in preparing the drawings. He seeks information about the flexibility, absorption, and optical characteristics of the material used to make the lenses.[1] Plaintiff also requests all reports regarding progress in design of the lenses, as set out in his request for production (Item 194, # 1). Two of plaintiff's expert consultants, Mr. Richard Lindmark and Dr. Allan Isen, state that they need this infor-

---

1. During oral argument, counsel for Bausch & Lomb noted that plaintiff was sent a letter dated August 19, 1982, in which all characteristics measured by Bausch & Lomb were provided.

These included such features as the tensile strength, elongation, and water content (Item 206, Exh. A). All Bausch & Lomb lenses are made of the same material.

mation as it relates to the "dimensions, thicknesses, curvatures and configurations" of the lens (Item 176, Exhs. 2 and 8).

Dr. Baron's patents, however, do not cover a manufacturing process or describe in any detail the characteristics of the material used. No specific measurements or dimensions are required by the patents. What the patent protects is the geometric configuration of the lens as described in the claims. Plaintiff has in his possession both the design drawings[2] and the actual contact lenses. Plaintiff has shown his ability to photograph these lenses and enlarge the photographs, to compare them with the design drawings, and to compare them with the claims of the patents (Item 176, Exhs. 2 and 4).

Defendant has stated that the production of documents and reports requested by plaintiff would be greatly burdensome, since thousands of documents are involved. Furthermore, the manufacturing information demanded by plaintiff is highly confidential. Counsel for defendant described Bausch & Lomb's unique "spin-casting" manufacturing technique. The details of this process would be highly prized in the competitive contact lens market. Since plaintiff has the actual lenses, and keeping in mind the nature of the claims which govern his patents, the information sought by plaintiff is unnecessary to defend against the summary judgment motion.

■ During oral argument, counsel for plaintiff also urged that he needs more discovery to show infringement under the doctrine of equivalents. He could only say, at this point, that there *may* be infringement under that doctrine. Even without literal infringement, an accused article may still infringe if it does substantially the same function in substantially the same way to achieve the same result. *Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 610, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950).

Baron has stated that the "essence" of his invention is a lens which has added mass between the optical area and edge of the lens to properly center on the eye while obtaining good visual acuity (Item 175, pp. 31–32). By seeking discovery of manufacturing processes and reports of design changes, Baron apparently expects to show that defendant added mass to the peripheral area to stabilize it on the eye.

Even if this were so, it would not be sufficient to show infringement. In most cases when the issue is infringement by the doctrine of equivalents, material issues of fact will often prevent summary judgment. *Martin v. Barber*, 755 F.2d 1564 (Fed.Cir. 1985). Baron cannot rely, however, on the doctrine of equivalents to regain what he surrendered during the prosecution of his patent application. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 258 (Fed.Cir.1985); and *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed.Cir. 1984). As will be discussed more fully below, plaintiff repeatedly sought to obtain a patent for a generally thickened peripheral area and was repeatedly turned down by the Patent Office (*see* Item 160, Prosecution History). His patents were accepted only when he added the specifics found in Claim 1 of each patent. If the lenses lack

---

**2.** There had been some dispute as to the accuracy of the computer-produced design drawing collection. Much of this confusion arose when plaintiff compared the drawing of a Low Minus B3 (-12.00 diopter) lens with a photograph of a High Minus B3 (-19.50 diopter) lens (Item 175, p. 12). The confusion was resolved when defendant compared the proper photographs to the drawings (Item 182, p. 3A). Defendant has submitted unrefuted affidavits attesting to the accuracy of its drawings (Item 182, Exh. A; Item 185, Apollonio affidavit; and Item 191). These affidavits attest not only to the accuracy of a *particular drawing*, but to the accuracy of the computer drawing *process*. Although pressed by the court to say *why* or *how* the drawings were inaccurate, plaintiff could only state that the drawings may be shown to be inaccurate at a later time, pending discovery. However, plaintiff has had the drawings *and* lenses for three years. He has been free to show the court at any time, using photographs such as those produced by Mr. Lindmark or any other technique, that the drawings and data produced by the Bausch & Lomb computer are inaccurate. He has failed to do so.

these characteristics, they do not infringe under *any* theory.

In the affidavit by plaintiff's expert consultant, Mr. Lindmark, he prefaced his discussion of the need for further discovery with the following:

> In order for one knowledgeable in the field to be able to determine whether a specific contact lens *incorporates the principles* covered by Dr. Baron's patents....

Item 176, Exh. 2, p. 11 (emphasis added). The question, however, is not whether the accused lens "incorporate the principles" of the patent, but whether they violate the claims as construed with the prosecution history.

Plaintiff's motion to compel production of documents set forth in Item 144, No. 1, is denied, as is his motion to compel answers to interrogatories (Item 131) which seek the information discussed above. The court can now address the motion for partial summary judgment.

*Bausch & Lomb's Motion for Partial Summary Judgment*

Pursuant to 28 U.S.C. § 1295(a)(1), the Federal Circuit assumed exclusive jurisdiction over appeals in patent actions. The Federal Circuit has stated that summary judgment is as appropriate in a patent case as in any other case. *Petersen Manufacturing Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 1546 (Fed.Cir.1984). There must be no genuine issue of material fact, and the movant must be entitled to judgment as a matter of law.

> The issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another. The first is a question of law; the second a question of fact.

*Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983) (citation omitted).

While the facts and inferences of fact must be viewed in the light most favorable to the non-moving party,

> The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984).

*Claim Construction*

Claims must be construed in connection with the specification, drawings, and prosecution history. *Autogiro Co. of America v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55, (1967); *Fromson v. Advance Offact Plate, Inc.,* 720 F.2d 1565, 1570 (Fed. Cir.1983). (*See* Defendant's appendix to its motion for summary judgment, Item 160.)

Plaintiff filed four applications before the issuance of his 802 patent. After an initial rejection of his first application, Baron amended his independent claim to state, in the last clause:

> [A]nd an outer peripheral surface portion tapering from a thin edge to an intermediate point of maximum thickness and then tapering toward the center of the lens.

Item 160, p. 21. This application was rejected as unpatentable over prior art and for obviousness (Item 160, p. 30). Baron again discussed thickness or mass in his third application, calling for "additional mass" at the lower portion of the lens in two of his dependent claims. These claims were rejected (Item 160, pp. 89 and 96). In his fourth and final application, Baron offered two independent claims, both of which ended with the clause:

> [A]n outer peripheral surface portion tapering from a thin edge to an intermediate point of maximum thickness and then tapering to the center of the lens.

Item 160, p. 138. This variant was also rejected.

Ultimately, Baron amended his application to what is now Claim 1 of the 802 patent:

A contact lens adapted to adhere to the cornea while at the same time maintaining good visual acuity, said lens being fabricated from transparent, soft, flexible, hydrophilic, cross-linked polymeric material; said lens having a generally spherical concave inner surface which conforms substantially to the curved surface of the cornea when positioned thereon, said lens having a generally convex outer surface providing a centrally located optical zone, the concave and convex surfaces intersecting at the periphery of the lens to form a relatively thin, knife-like edge, said *lens being provided with a thickened annular bead portion extending outwardly from said convex surface between the optical zone and the lens edge, said bead portion having a curved, convex outer surface and a generally centrally located portion defining the area of maximum thickness of the lens.*

(Emphasis added.)

It is noted that Baron's final Claim 1 initially said that the bead portion had a "centrally located portion defining the area of maximum thickness thereof." (Item 160, p. 198.) However, before it was approved in final form, Baron was required to agree to change "thereof" to "of the lens." (Item 160, pp. 211–12.) The center of bead must be the thickest portion of the entire lens, not just the bead.

In addition to the claims, Baron submitted eight drawings, the first three showing a side view of a contact lens:

Figures 1, 2, and 3
of Baron's '802 and '890 Patents

Figure 3 is an embodiment of the 802 patent: it has the requisite annular bead portion, with the greatest thickness towards the center, extending outwardly from the surface. In his application for what was eventually his 890 patent, he stated: "Basically, claim 1 of the '802 Baron patent literally reads on the embodiment of fig. 3 of the drawings of that patent...." (Item 160, p. 288).

In the first of two applications for the 890 patent, plaintiff again presented Fig-

ures 1–3. He initially offered, as part of Claim 1 of that application:

> [S]aid lens having a centrally located optical zone and a peripheral portion extending outwardly from said optical zones and terminating in a relatively thin edge of the lens, said peripheral portion having its maximum thickness at a region intermediate said edge and the juncture of said peripheral portion and said optical zone.

Item 160, p. 238.

In the second successful application, Baron clearly stated that, while both figures 2 and 3 embodied his invention, figure 1 was not covered by the patent (Item 160, p. 393).[3] He offered an amended Claim 1, which emerged as the final 890 patent:

> A contact lens adapted to be positioned adjacent the cornea while at the same time maintaining good visual acuity, said lens being formed from a transparent, soft, flexible, hydrophilic, cross-linked polymeric material and having an outer surface and a concave inner surface that conforms generally to that surface of the cornea adjacent to which it is located, said lens having a centrally located optical zone and terminating in a relatively thin edge of the lens, the juncture of said optical zone *and said peripheral portion being defined by a visually apparent change in the shape of said outer surface of said optical zone at said juncture, said peripheral portion having a region intermediate said edge and said juncture, said region being thicker than at said edge or said juncture.*

Item 160, p. 354 (emphasis added).

In light of this history, the 802 patent is limited to the embodiment depicted in Figure 3, while the 890 covers both those in Figures 2 and 3. Neither covers Figure 1, or the Minisculent-type lens (Item 160, pp. 200–01).[4]

The entire prosecution history reveals efforts by plaintiff to patent a lens which had additional mass or thickness in a region outside the optical area and before the edge of the lens. Such efforts were repeatedly rejected, and plaintiff is now confined to the language of his claims. He cannot show literal infringement or infringement under the doctrine of equivalents without the specific features set forth in the claims.

*Infringement*

In describing the differences between the Baron patents and the accused minus lenses, defendant focused on a representative lens, Low Minus B3 (–12.00 diopter). In an answer to an October 1982 interrogatory, plaintiff had stated that almost all of defendant's lens series were representative of the lens design alleged to infringe the 802 patent (Item 160, p. 442). After plaintiff pointed out a consistent difference in configuration between defendant's "high" and "low" minus lenses, defendant also selected a representative high lens, High Minus B3 (–19.50 diopter).

Plaintiff now urges that *each* lens has a distinct configuration and that this court must examine each individual minus lens in deciding the motion for partial summary judgment (Item 201, pp. 1 & 2). Defendant agrees that each lens is slightly different. This is inevitable, since each lens is of a certain power to correct a given level of visual impairment. Plaintiff loses sight of the fact that differences are only significant if they are *material* to the issue of infringement. Baron cannot rest on the blind assertion that each lens is different—

---

**3.** The court notes the inconsistency in Dr. Baron's position. While he conceded at oral argument that Figure 1 is outside the scope of the patent, he had previously stated that defendant's minus lenses were most similar to Figure 1.

> [I]t is felt that the lens contained in the drawings pertaining to [the minus lenses] more closely correspond in design to those lenses illustrated in figures 1, 4, 5, and 8....

Plaintiff's Answer to Interrogatory 39, dated October 16, 1982 (*see* Item 160, p. 449).

**4.** Although the minisculent-type lenses are not covered by the patents, when asked to identify all differences between the peripheral portion of those lenses and the accused Bausch & Lomb lenses, plaintiff could only state that the minisculent lenses were hard lenses, whereas the Bausch & Lomb lenses are soft (Item 74).

on a motion for summary judgment, it is his burden to show the court how they materially differ. He has had the opportunity to direct the court's attention to any and all lenses which he believes infringe his patents.

Using the final claims of the patents, the figures found in patent applications, the Minisculent references distinguished by Baron, and the design drawings and photographs of the Low Minus B3 (-12.00 diopter) and High Minus B3 (-19.50 diopter) lenses, defendant has shown that its lenses do not infringe plaintiff's patents (see Appendix). In response, plaintiff offers no evidence to create a *factual* dispute, but rather opinions.

The court finds no *genuine* issue of *material fact* as to the following: the cross-sectional photos submitted by defendant are accurate depictions of the accused lens. The sole difference is the sagital depth, which is not significant in light of the patents (Item 191, Apollonio declaration). Furthermore, there is *no* evidence that the design drawings are inaccurate. All photographs of the actual lenses support the accuracy of the drawings. Based on a review of the design drawing collection, the Low Minus B3 (-12.00 diopter) lens is representative of defendant's low minus lenses, and the High Minus B3 (-19.50 diopter) lens is representative of the high minus lenses. There is no evidence to the contrary. Nei-

ther the Low Minus B3 (-12.00 diopter) nor the High Minus B3 (-19.50 diopter) lens has the requisite annular bead portion extending outwardly from a convex surface with a centrally located portion defining the maximum thickness of the lens. Nor do the minus lenses have a visually apparent change at the juncture between the optical zone and peripheral region, with a thickened area between the juncture and the lens. The peripheral region of the Bausch & Lomb minus lenses continuously taper to the edge.

In defending against the summary judgment motion, plaintiff relies on the affidavits of Dr. Isen (Item 176, Exh. 7) and Mr. Lindmark (Item 176, Exh. 2, and Item 187).[5]

Dr. Isen compared the drawings to the claims of Baron's 802 patent. In his opinion:

Reading the claims as they would be by those of ordinary skill in this art, all of the lenses described in the confidential design drawing collection supplied by Bausch & Lomb, except those contained in the minus C and low plus N series infringe Claim 1 of Patent No. 3,698,802. The following series violate Claim 2: low minus N, low minus F, low minus B, low minus J, low minus U, low minus U3. The following series of lenses violate Claim 3 of this patent: low minus F3, low minus B3, low minus J3, low minus

---

5. On September 26, 1985, I received an affidavit from Neal J. Bailey, a contact lens expert for plaintiff. I did not consider this affidavit in reaching my decision. It was filed almost five months after the original briefs were filed and one month after oral argument. This is simply too late.

Although plaintiff claimed that Mr. Bailey could not have drafted his affidavit at an earlier time because he did not have access to the design drawings, I do not accept this as an excuse. I note that defendant had offered to permit Bailey to see the drawings as early as February of 1985 if Baron would remove one of his consultants. Plaintiff did not; therefore, any delay rests with him.

Also, in glancing through Bailey's affidavit, he only mentions the drawings twice in a conclusory fashion, giving his opinion that every minus lens violates the 802 patent. (He does not discuss the 890 patent.) This is not

substantiated by *fact*. In the rest of the affidavit, he discusses the general process for making Bausch & Lomb lenses and concludes that the lenses infringe. None of his conclusions was in any way tied to the information in the drawings. Baron had the actual lenses for three years and was free to show them to Bailey at *any* time. Bailey, who served as an investigator for the Food and Drug Administration in evaluating Bausch & Lomb lenses, has long known of defendant's manufacturing processes.

Finally, in looking at the last two paragraphs in the affidavit, it appears that Bailey is resting on the doctrine of equivalence: that adding mass to the peripheral area of the lens shows infringement. This was disposed of earlier. In light of the prosecution history, adding mass alone is insufficient to show infringement by equivalence.

U3, minus B4, minus U4, high plus N, plano T, high plus F3, low plus F3, high plus J3, and high plus B3.

As to the 890 patent:

Reading the claims as normally construed by those of ordinary skill in the art, all of the lenses illustrated in the confidential design drawing collection except those described in the minus C series and low plus N series violate Claims 1, 2, 3 and 5 of Patent No. 4,084,890.

These opinions do not constitute "counter statement[s] of fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d at 835–36. They are totally conclusory, and insufficient to establish a genuine issue of material fact.

Mr. Lindmark submitted two affidavits, one in which he stated that he examined an enlarged photograph of a Low Minus B3 (-12.00 diopter) lens. In his *opinion,* it infringed Claim 1 of the 802 patent (Item 187, paragraph 8). In stating why he believed it infringed Claim 1 of the 802 pat-

ent, Lindmark repeated the elements of the claim and said that he observed them in the photograph. This statement is conclusory and does not establish a counter statement of *fact.* It is the opinion of Mr. Lindmark that a given photograph reveals certain features. No expertise was required; the court can itself compare the photograph and drawings to the patent. The outer surface of the low minus lenses has a constant radius which abruptly tapers to the edge. (This is very similar to the non-infringing minisculent lens. There is no bead. Figure 5, Appendix.)

In Mr. Lindmark's earlier affidavit, he stated that he believed the F3 -19.50 series, B4 -8.50 series, and B3 -19.50 series infringed the 802 patent. Again, he simply offered his opinion that the lenses had the features of the claim (Item 176, ¶ 12).

Mr. Lindmark provided a more detailed statement as to infringement only as to to Bausch & Lomb's High Minus B3 (-19.50 diopter) lens (Item 176, Exh. 2, ¶ 14). He referred to the following diagram:

**Baron's "Successful" Photocopy of Photograph of Actual B & L High Minus B3 (-19.50 diopter) Lens**

Between points A and B, he stated that the radius forms an arc which is "more or less circular and can, in his opinion, appropriately be called a 'bead.'"

The area between points A and B is not the "thickened annular bead" required by Claim 1 of the patent. A bead has been variously defined as a "ball shaped body,"

324

a "drop," a "bubble," or a "blob." *Webster's New Collegiate Dictionary*, 1981. As Baron represented to the patent office, Figure 3 is the embodiment of his 802 patent (*see* Appendix 1). Figure 3 shows a definite bead, in which there is the area of maximum thickness of the lens.

Even if the area between points A and B could appropriately be called a bead, it lacks a "generally centrally located portion defining the area of maximum thickness of the lens." The "bead" does not extend "outwardly from the convex surface" of the lens, as in Figure 3 (*see* Exhibits A, B, and C to the Lindmark affidavit). Mr. Lindmark's opinion that the high minus lens shows a "bead" does not create a factual dispute. Even if there were such a bead, it lacks the other features required by the patent, so any dispute would not be material.

As for the 890 patent, in paragraph 15 of his affidavit, Mr. Lindmark discusses possible infringement by the high minus lenses (Item 176, Exh. 2). He believes that there is a visually apparent change in the lens between the optical zone and peripheral portion, and that the lens ends in a thin, knife-like edge (*see* Exh. D to Lindmark affidavit). He notes that the thickness of the peripheral region cannot be determined from the photograph in Exhibit D, which is a "head-on" shot of the lens.

Such thickness is required by the patent, as seen in Figure 2 or Figure 3. As can be seen from defendant's drawing and photographs of the cross-sections of the lenses, the lens tapers from point B (*see* Diagram, *supra*) to the edge. Even if point B represents the "visually apparent change" between the optical zone and the peripheral region, it is still the thickest part of the lens. The patent requires that the peripheral portion be thickest between the juncture and the edge, not at the juncture.

Baron offers no evidence to show that the low minus lens infringe the 890 patent. Such lenses clearly have only one change in the outer surface and taper rapidly to the edge from that point. There is no thick area.

 This litigation has proceeded for over six long years. During the course of that time, plaintiff Baron has had ample opportunity to demonstrate infringement. In response to the motion for summary judgment, Baron presents no *evidence* of infringement, but relies on opinion. There being no disputed fact, the court grants summary judgment as to the minus lenses.

The parties shall proceed with discovery as to the remaining portion of the case, the plus lenses. The court notes that Dr. Michael Friedberg has filed a statement withdrawing as a consultant (Item 205). Mr. Lindmark has provided an affidavit stating that he has sold all interest in Flexlens, Inc. (Item 204). Unless objections are heard from Bausch & Lomb, on or before November 15, 1985, Mr. Lindmark shall be substituted as a consultant.

So ordered.