**WAYNE AUTOMATION CORP.,**
**a Pennsylvania corporation,**
**Plaintiff,**

v.

**R.A. PEARSON CO., a Washington**
**corporation, Defendant.**

**No. CS–90–345–FVS.**

United States District Court,
E.D. Washington.

Aug. 27, 1991.

See also 790 F.Supp. 1505, 782 F.Supp. 516.

Mark W. Hendricksen, Layman, Loft, Arpin & White, Spokane, Wash., Frederick J. Olsson, Wayne, Pa., for plaintiff.

Richard J. St. John, Mark S. Matkin, Wells, St. John & Roberts, Spokane, Wash., for defendant.

## OPINION

VAN SICKLE, District Judge.

This is an action for infringement of United States Patent No. 4,829,747 (hereinafter patent '747). The plaintiff is Wayne Automation Corporation (hereinafter Wayne); the defendant is R.A. Pearson Co. (hereinafter Pearson).

The Court has jurisdiction over Wayne's claim by virtue of 28 U.S.C. § 1338(a); venue is proper under 28 U.S.C. § 1400(b). Neither jurisdiction nor venue are contested. In addition, Pearson's counterclaim for a declaratory judgment of noninfringement is properly before this Court pursuant to 28 U.S.C. §§ 2201 and 2202.

A. Background

When goods are to be shipped, it is often necessary to devise a means to protect the goods from damage. One way to do that is to insert a partition into the container in which the goods will be shipped. The partition separates the container into compartments so that each item can be placed in a precisely determined, separate space.

Historically, partitions were prefabricated and supplied to the shipper in a collapsed state. The shipper manually opened each partition and inserted it into the container.

What was once done manually can now be done mechanically. A partition inserter

can grip a collapsed partition, expand it, and insert it into a carton.

Both Wayne and Pearson manufacture and sell partition inserters to companies which package and ship goods in containers. Both companies have done so for many years.

Ordinarily, a business which ships its goods in partitioned containers buys its partitions from some other company. The partitions arrive in the shipper's plant in bundles, usually by the pallet load. Each bundle consists of collapsed partitions which have been strapped together. Because of its size and shape, a bundle is often referred to as a football.

To be useful, partitions must be removed from bundles, expanded, and inserted into containers. That is a multi-step process. However, only a very limited part of that process is at issue in this litigation. Here, the inquiry is into the method used by a partition inserter to grip individual partitions.

Typically, a partition inserter has a conveyor belt onto which bundles of partitions are loaded after the strapping is removed. As the partitions move into the machine, they reach a place called the pull-out station. There, the partition inserter must grip each partition one at a time.

The inventors of patent '747 developed a method which enables a partition inserter to grip individual partitions. Generally speaking, patent '747 teaches a method in which a set of vacuum cups makes contact with a partition, pushes against it to grip it, and then pulls it away.

A. David Johnson, Jr., and Joseph L. Bachman are senior officials at Wayne, and two of the three named inventors of patent '747. During 1990, they became suspicious that a partition inserter which is manufactured and sold by Pearson (the Y1903) utilized a method for gripping individual partitions which infringes upon patent '747. After consulting with patent counsel, Mr. Johnson and Mr. Bachman travelled to a plant in Freehold, New Jersey, where one of Pearson's Y1903 partition inserters had been installed.

Mr. Bachman is an engineer with many years experience in the packaging industry. He is the one who actually watched the operation of the Y1903. After examining it, he concluded that it had been adjusted so as to infringe on patent '747. Based upon Mr. Bachman's observations, Wayne caused a complaint to be filed against Pearson which alleged direct infringement in violation of 28 U.S.C. § 271(a), and induced infringement in violation of 28 U.S.C. § 271(b).

Prior to trial, a bifurcation of issues was ordered. Consequently, this phase of the litigation was devoted solely to the issue of infringement.

At the end of Wayne's case, its inducement claim was dismissed for lack of sufficient evidence. That left only the question of direct infringement, which was at issue not only because of Wayne's complaint, but also because Pearson had filed a counterclaim requesting a declaratory judgment of noninfringement.

## B. Findings of Fact

The Court finds as follows:

1. Wayne is a Pennsylvania corporation whose principal place of business is Norristown, Pennsylvania.

2. Pearson is a Washington corporation whose principal place of business is Spokane, Washington.

3. Patent '747 is the patent in suit, and it was issued as United States Patent No. 4,829,747 on May 16, 1989.

4. Patent '747 is wholly owned by Wayne.

5. Both Wayne and Pearson manufacture a machine which is known as a partition inserter. The Pearson partition inserter which is relevant to this litigation is designated as model Y1903.

6. Partitions have different structures or forms. The type which is involved in this litigation is called a multicell, crossed-panel partition.

7. Partitions are made from different kinds of materials. A partition may be classified according to the material from

which it is made. One type is referred to as "solid fiber" or "chipboard"; another type is referred to as "corrugated." The thickness of a partition will vary depending upon the material from which it is made. For example, a "chipboard" partition tends to be thinner than a "corrugated" one.

8. Partitions are assembled and shipped in a "collapsed" state. In its collapsed state, a partition tends to be thicker in the middle, and thinner on each end. Consequently, each partition is curved to some extent.

9. Partitions are shipped in bundles. Each bundle is thicker in the middle, and thinner on each end. Because of its size and shape, a bundle tends to resemble a football.

10. The curvature of a partition may vary because of the partition's location in the bundle when it is first bound, the type of strapping material used to bind the bundle, the number of bundles shipped on a pallet, or the moisture content of the partition. A partition in the middle of a bundle may be relatively flat when compared to a partition on one side or the other of the bundle.

11. Before a partition can be inserted into a container it must be removed from its bundle and opened. Pearson's Y1903 is designed to facilitate that process.

12. At some point after a group of bundles arrives at the customer's plant, the strapping is removed from each bundle. Once that is done, an operator loads each set of partitions onto what is known as the "magazine" or "hopper" of the partition inserter.

13. The Y1903 has a horizontal magazine, as opposed to a vertical magazine. The magazine of a Y1903 looks like a horizontal conveyor belt. Many sets of partitions can be laid on the belt at any given time. That is necessary so that the operator can keep ahead of the machine.

14. When the operator has finished loading partitions onto the mesh belt of the horizontal magazine, the operator lowers a backstop. The backstop is a rectangular piece of metal which is attached to the

inserter, and is designed to fit snugly against the last partition. The movement of the mesh belt and the backstop are coordinated. As the mesh belt moves forward, so does the backstop. The combined movement of the two keeps continuous pressure against the partitions. As a result, the partitions remain densely packed.

15. There is a limit to the forward movement of the backstop. When that limit is reached, the operator must move the backstop back and refill the magazine. The partitions remain tightly compressed even as the backstop reaches its forward limit.

16. The partitions move forward until the lead partition comes to rest against three "stops." A "stop" is device which prevents the lead partition from moving any further forward until it is pulled away from the rest of the partitions by a set of vacuum cups. There is a single stop on each side of the belt, and one which is centered above the belt so that the top of the lead partition hits it. The two side stops are fixed; the center stop is adjustable. When a partition has come to rest against the stops, it is in the pull-out station.

17. The mesh belt has a rough surface. Through the forward action of the belt and the backstop, the partitions are pressed firmly against the stops.

18. Pearson has designed the Y1903 so that the center stop, which is adjustable, is set in a position which is slightly forward of the two side stops. As the belt moves the partitions toward the stops, the end of each partition hits a side stop before the middle hits the center stop. Since there is continuous pressure against the lead partition, it is forced into a slightly convex curve, and held firmly in that position.

19. A photoelectric cell is positioned adjacent to the stops. The cell shoots a beam of light across the path of the moving partitions so that the beam is perpendicular to the mesh belt and the moving partitions. If the beam of light is reflected back to the cell from a reflector on the opposite side, a switch activates the mesh belt, and it indexes partitions forward until the lead parti-

tion obstructs the beam of light. At that point, the lead partition is being pressed against the stops.

20. If necessary, the photoelectric cell and switch can be adjusted to insure that adequate pressure is brought to bear against the lead partition.

21. The Y1903 is designed so that a series of bellows vacuum cups grip the lead partition after it is pressed against the stops. After engaging the lead partition, the vacuum cups pull it away from the set.

22. The Y1903 has a cantilevered arm to which bellows vacuum cups are attached in an adjustable arc. The arc is adjusted until it matches the curve into which the lead partition is forced when pressed against the stops. Each cup is set so that it engages a separate panel of the lead partition. The bellows cup is used because it collapses slightly when it comes into contact with a partition.

23. When a partition is pressed against the stops, the arm to which the cups are attached moves toward the partition and a compressor creates a vacuum in each of the bellows cups.

24. During the trial, the Court witnessed a demonstration of a model which replicated the method which the Pearson Y1903 uses to grip partitions. The Court specifically finds that the model accurately demonstrated all material steps in the process. As a result, the Court was able to see the following take place: The cantilevered arm was adjusted so that it brought the vacuum cups forward until they made superficial contact with the panels of the lead partition. As each cup closed with a separate panel, the vacuum caused the panel to attach to the cup. In effect, each panel of the lead partition was pulled toward a cup by virtue of vacuum and the characteristics of the cup.

25. When the Y1903 is operated according to Pearson's specifications, the lead partition is not pushed back a significant distance from the stops by the bellows cups as they grip the partition.

26. No significant pushing force is generated when a bellows cup engages a panel of the lead partition. It is unnecessary for the bellows cups to push against the lead partition in order to grip it because of the following factors: the arc in which the cups are set; the vacuum which is created in each cup as it approaches the lead partition; and the physical characteristics of a bellows cup.

27. After the cups have attached to the lead partition, the arm reverses direction and pulls the lead partition away from the set in a manner so that there is no significant movement of the lead partition back into the remaining partitions on the mesh belt. The arm transports the partition away from the set; rotates the partition ninety degrees downward; and releases the partition. The arm then returns to engage another partition.

28. An adjustment of the Y1903 so that the bellows cups generate more than a minimal amount of pushing force would create excessive stress on the cups and the cantilevered arm. Such an adjustment would be contrary to the optimal long-term use of the machine.

29. The design of the machine does not contemplate an adjustment of the Y1903 which attempts to cause the bellows cups to force the lead partition back into the set a significant distance in order to grip the lead partition.

30. Pearson instructs each purchaser in the use of the Y1903. The instruction includes training not only in Pearson's plant, but in the purchaser's plant as well. Pearson also provides an operation manual. Neither Pearson's training nor its manual explain to a purchaser how to adjust the vacuum cups so that the cups attempt to push the lead partition back into the set in order to grip it.

31. A. David Johnson, Jr., and Joseph L. Bachman are among the named inventors for patent '747. They are senior officials at Wayne.

32. During 1990, Mr. Johnson and Mr. Bachman became suspicious that the Y1903 was being operated in a manner which infringed upon patent '747. After consulting with patent counsel, they made arrange-

ments to inspect a Y1903 which had been installed in a plant in Freehold, New Jersey. Although both men were present while the machine was being operated, only Mr. Bachman had an opportunity to inspect the bellows cups as they engaged partitions.

33. Mr. Bachman is trained as an engineer, and has extensive engineering experience in the packaging industry. Although Mr. Johnson does not have as much formal education in engineering, he, too, has substantial work experience in the packaging industry.

34. After discussing Mr. Bachman's observations, Messrs. Johnson and Bachman concluded that the Y1903 bellows vacuum cups pushed the lead partition back into the set.

35. On two subsequent occasions, Mr. Johnson observed Pearson's Y1903 in operation. One was in a plant in Lapel, Indiana, and the other was in a plant in Winchester, Indiana. Mr. Johnson concluded that each machine's bellows vacuum cups pushed the lead partition back into the set.

36. The action of the Y1903 partition inserters described by Messrs. Bachman and Johnson is the result of an adjustment to the machine which was made after the machine left Pearson's control.

37. The Court cannot determine the identity of the person(s) who made the described adjustments, nor can the Court determine the date the adjustments were made.

38. Pearson had no notice that a customer intended to make the described adjustments, nor did Pearson know, prior to the filing of the complaint, that such adjustments had actually been made.

39. Pearson never suggested to any purchaser of a Y1903, either directly or indirectly, that the purchaser make the adjustments described by Messrs. Johnson and Bachman.

40. Pearson had no reason to believe any purchaser would operate a Y1903 in a manner contrary to that recommended by Pearson.

41. Wayne caused a Complaint for Patent Infringement to be filed in this District on August 17, 1990. No formal written opinion regarding infringement of patent '747 by Pearson was issued by patent counsel prior to the filing of the complaint.

42. On August 9, 1990, Wayne's patent counsel signed a cover letter which was sent with a Certificate of Correction for patent '747 to the Patent and Trademark Office.

43. On November 26, 1990, Wayne's patent counsel formally requested the Patent and Trademark Office to expedite handling of the Certificate of Correction.

44. On January 30, 1991, Wayne's patent counsel requested reexamination of patent '747 by the Patent and Trademark Office. Thereafter, Wayne moved for a stay of the action pending reexamination, but the motion was denied by order entered on March 12, 1991.

45. On June 28, 1991, Pearson moved for bifurcation of the trial. A stipulated order which provided for bifurcation was entered on July 8, 1991.

C. Analysis of Patent Infringement Allegations

Patent '747 has twelve claims, but the parties have agreed that only three are in dispute. The Court must first interpret the three disputed claims, and then determine whether the claims read literally on the method used by the Y1903 for gripping the lead partition. *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1114 (Fed.Cir. 1983) (citing *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 401, 155 USPQ 697, 705 (Ct.Cl.1967)).

1. *Claim Interpretation*

The three disputed claims of patent '747 are claims 7, 11, and 12. Each of the three claims describes the same method. The language quoted below, which is from claim 7, is representative of all three claims. It states, in pertinent part:

using a plurality of vacuum cups, *engaging* the lead partition and *pushing* the same into the set in a direction along said

axis to insure the creation of gripping forces by each said vacuum cups on respective panels of the bent lead partition and thereafter reversing the direction of motion and *pulling* the lead partition out of the pull-out station.

'747 Patent, Claim 7, col. 7, ln. 16–22 (issued May 16, 1989) (emphasis added).

To determine what a claim means, the Court reviews claim language, the specification, and the prosecution history. *Smithkline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir. 1988). Having done that, the Court concludes that claims 7, 11, and 12 describe a three-step process: (1) the vacuum cups engage the lead partition; (2) the cups push against the lead partition causing some significant backward movement of the partition so that the vacuum cups can grip the partition; and then (3) the cups reverse direction thereby pulling the lead partition out of the pull-out station.

Pearson argues that the second step in the process should be limited by the specification. Pearson cites the following passage:

To accommodate the bent condition, the invention contemplates moving the vacuum cups 6 so that the lead partition is pushed back into the set. *This action tends to cause the partition to assume a planar form so that the cups will be able to grip a flat surface to develop a vacuum.*

'747 Patent Specification, col. 4, ln. 14–19 (issued May 16, 1989) (emphasis added). Pearson asks the Court to define the term "pushing" to mean pushing the lead partition back so that it assumes "a planar form."

■ The Court is not persuaded by Pearson's argument. According to the plain language of the claims 7, 11, and 12, the method requires only that the lead partition be pushed back into the set. "The terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988) (citing *Envirotech Corp. v. Al George, Inc.*, 730 F.2d

753, 759, 221 USPQ 473, 477 (Fed.Cir.1984). Here, there is nothing to suggest that the inventors intended the terms of the claims to have other than their ordinary meaning. The Court concludes that the fact that a lead partition may assume a planar form when pushed by the vacuum cups is merely a consequence of the operation of the method, not an essential part of it.

### 2. *Infringement*

Wayne has alleged direct infringement of patent '747, but does not assert the applicability of the doctrine of equivalents. Pearson has counterclaimed for a declaratory judgment of non-infringement.

■ Whereas claim interpretation is a matter of law, *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985), evaluation of an accused method in light of the properly interpreted claim is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983).

■ Infringement (or, in the case of Pearson's counterclaim, non-infringement) must be proved by a preponderance of the evidence. *Smithkline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). "Such proof must show that every limitation of the patent claims asserted to be infringed is found in the accused device, either literally or by an equivalent." *Id.* at 889.

■ Claims 7, 11, and 12 describe a three-step process. Pearson does not deny that its method utilizes steps one and three. The question, then, is whether the Y1903 copies step two. In other words, when the bellows vacuum cups engage the lead partition, do they then push against it so as to cause some significant backward movement of the lead partition into the set? Based upon the findings of fact set forth above, the Court determines by a preponderance of the evidence that the Y1903 bellows vacuum cups do not cause significant backward movement of the lead partition after engaging it.

The lead partition is forced into a slightly curved position through the combined interaction of the backstop, the mesh belt, and

the three stops. The degree of curvature remains relatively constant. That being the case, the operator can arrange the bellows vacuum cups on the cantilevered arm in an arc which matches the degree of curvature. The design of the Y1903 does not require the bellows cups to drive into the lead partition in order to grip it. Instead, vacuum is created in each cup as it engages the partition so that the cups pull the partition away from the pull-out station.

Therefore, the Court finds that Pearson's Y1903 does not utilize the second step of the method described by patent '747. Since not every limitation included in the disputed claims of patent '747 is incorporated into the accused method, there is no direct infringement.

### D. Exceptional Case

This Court has authority pursuant to 35 U.S.C. § 285 to award reasonable attorney fees and costs to the prevailing party in an exceptional case. Pearson has requested the Court to rule that this is an exceptional case, and to make an appropriate award of fees and costs.

Pearson must prove by clear and convincing evidence that this is· an exceptional case. *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed.Cir. 1990).

■ Although there is no formula for determining whether a case is exceptional, an award of attorney fees and costs to an accused infringer who prevails at trial is often based upon a finding that the patentee procured the patent through "fraud or inequitable conduct," or that the patentee brought or continued the litigation in bad faith. 5 D. Chisum, *Patents* § 20.-03[4], at 20–198.7 (1991). Pearson relies on both theories in support of its request for fees and costs.

■ Pearson begins by pointing to the prolonged process which preceded the issuance of patent '747. Pearson insists that

the delay was intentional, and was designed to obtain a competitive advantage both by extending the effective life of the patent and by shielding Wayne's method from public scrutiny.

Though Pearson's first theory is vigorously argued, the Court declines to rule on it. Prior to trial, the Court approved a bifurcation of issues. This trial was concerned solely with infringement; neither party was allowed to litigate the question of the validity of patent '747. Thus, Wayne was entitled to rely on the presumption of validity created by 35 U.S.C. § 282, and was under no obligation to explain or justify the pre-issuance delays. Through no fault of either party, the record before the Court is not sufficiently complete to allow the Court to rule on Pearson's first theory.

Pearson's second theory is that Wayne commenced this action in bad faith, and continued it after it should have known it had no case. The record shows that at the time this action was filed, Wayne believed a single Y1903 employed a method of operation which was infringing on patent '747. To Wayne, this demonstrated that the process which the Y1903 was designed to use to pull the lead partition from the pull-out station simply would not work in the "real world." Faced with breakdowns, a purchaser would have to adjust the Y1903, and the only adjustment which would make the Y1903 work efficiently would be one which infringed upon patent '747.

From the premises set forth above, Wayne concluded that it could prove that direct infringement of patent '747 had occurred in at least one instance, and that Pearson had induced infringement by selling a machine that would work only by being adjusted so as to infringe. Although the Court ultimately determined that Wayne had failed to prove inducement, the Court cannot say that Wayne's theory was so devoid of factual support as to render the filing of this lawsuit an act of bad faith.[1]

---

1. The Court notes that Wayne did not conduct an investigation prior to filing this action to determine whether Pearson had instructed the operator of the Y1903 in the plant in Freehold, New Jersey, to make an adjustment which led to infringement. Although the Court believes a

Pearson also contends that it provided sufficient information to Wayne after the action was commenced to show Wayne that its allegations were baseless. Such information included inspection of Pearson's Y1903, depositions of Pearson's employees, and the viewing of a videotape of the operation of the Y1903. Extensive though it was, Pearson's disclosure did not completely rebut Wayne's allegations. The information which Pearson provided to Wayne tended to show that Pearson's Y1903 was not designed to infringe. But Wayne's theory did not depend upon proving the Y1903 was designed to infringe. All along, Wayne contended that regardless of the manner in which the Y1903 was designed to operate, the Pearson method would not work in practice. In light of its theory of the case, Wayne could have reasonably believed that its contentions remained unrefuted notwithstanding Pearson's disclosure.[2]

Finally, Pearson points out that Wayne filed a Certificate of Correction at approximately the same time this action was commenced, and requested re-examination of patent '747 several months later. Pearson contends that Wayne took those steps in order to stall. Pearson complains that because of Wayne's tactics it was forced to move the Court for a bifurcation of the trial.

The Court notes that respected commentators on patent law and practice advocate just the bifurcation which Pearson obtained. *See, e.g.,* Markey, *On Simplifying Patent Trials,* 116 F.R.D. 369 (1987). Furthermore, the Court fails to see how Pearson was prejudiced by bifurcation. Consequently, Wayne's pre-trial tactics are not exceptional.

The record before the Court at this time does not permit the Court to conclude, by clear and convincing evidence, that this is an exceptional case. Pearson's request for attorney fees and costs is denied.

**E. Judgement of the Court**

1. All remaining causes of action brought by Wayne Automation Corporation against R.A. Pearson Company are dismissed with prejudice.

2. R.A. Pearson Company is granted judgment that its Y1903 partition inserter, as presently designed, manufactured, and marketed, does not utilize a method which directly infringes on United States Patent No. 4,829,747.

---

more thorough investigation would have been the better practice, the failure to conduct such an investigation is not dispositive.

**2.** Pearson relies heavily upon the case of *Eltech Systems Corp. v. PPG Industries, Inc.,* 903 F.2d 805, 810–11 (Fed.Cir.1990). However, *Eltech Systems* is distinguishable on its facts. There,

the patentee, was "manifestly unreasonable in assessing infringement, while continuing to assert infringement in court." *Id.* at 811. Not only had the patentee failed to conduct a credible investigation, but it withheld information which might well have shown non-infringement. The same cannot be said of Wayne.